IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TERESA FISCHER AND DAVID FISCHER,

OPINION AND ORDER

               Plaintiff,

19-cv-156-bbc

      v.

SENTRY INSURANCE A MUTUAL COMPANY
AND ABC INSURANCE COMPANY,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This civil action brought under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act arises out of plaintiffs Teresa Fischer's and David Fischer's employment with defendant Sentry Insurance A Mutual Company from 2014 to 2017. (Plaintiffs also name ABC Insurance Company as a defendant, but it has no role in this decision. All further references to "defendant" are to defendant Sentry.) Plaintiffs contend that Teresa Fischer's supervisors at defendant discriminated against her because of her sex and gender, subjected her to a hostile work environment and then retaliated against her for complaining about it. Plaintiffs also contend that defendant discriminated against David Fischer because of his age and because he complained about the discrimination toward his wife.

Now before the court is defendant's motion for summary judgment, in which defendant contends that plaintiffs cannot prove any of their claims. Dkt. #28. I agree with defendant. Plaintiffs have failed to submit evidence from which a reasonable jury

1

could conclude that Teresa Fischer was terminated because she is a woman or because she complained about sex discrimination.  Instead, the undisputed evidence shows that Teresa was terminated because defendant concluded that she was not an effective restaurant manager.  Plaintiffs also have failed to submit evidence showing that Teresa was subjected to a hostile work environment or that David Fischer was discriminated against because of his age or because he complained about discrimination toward his wife.  Therefore, I will grant defendant's motion for summary judgment.

Before turning the facts, I note that I have disregarded dozens of plaintiffs' proposed findings of fact because they are either statements that violate this court's summary judgment procedures, statements that are not factual or statements that are supported solely by inadmissible evidence.  For example, plaintiffs purport to "incorporate by reference the entirety of the amended complaint," as one of their proposed findings of fact.  Plts.' PFOF ¶ 1.  This is not a proper proposed finding of fact.  James v. Hale, —F.3d—, No. 19-1857, 2020 WL 2487603, at *4 (7th Cir. May 14, 2020) ("[P]laintiff may not rely on mere allegations or denials in his complaint when opposing a properly supported motion for summary judgment.").  Plaintiffs also propose several facts that are supported only by hearsay evidence, such as testimony from plaintiffs' former coworkers about what plaintiffs told them.  Inadmissible hearsay evidence may not be considered at summary judgment.  Flanagan v. Office of Chief Judge of Circuit Court of Cook Cty., Illinois, 893 F.3d 372, 375 (7th Cir. 2018) (statements about what a colleague reported were properly excluded as inadmissible

hearsay when used for the truth of the matter asserted).

Plaintiffs also propose several facts that are irrelevant to plaintiffs' claims, including proposed facts about purported sexual harassment of another employee, about which plaintiffs were unaware, and misconduct by a human resources advisor that occurred after Teresa Fischer's employment ended.   I have disregarded those facts.

Finally, plaintiffs propose several statements as facts that are conclusory statements, arguments or opinions, such as the following:

- "Front-of-house women, including Teresa, at Sentry were treated more harshly than their male counterparts by both James and Payne because they were women."   Plts.' PFOF ¶ 37.

- "Payne was harsher to women than men."   Plts.' PFOF ¶ 39.

- "Payne behaved like an ogre and a pig towards women, including Teresa, while he was her supervisor."   Plts.' PFOF ¶ 45.

- "Payne had a God complex, a superiority complex, and behaved like a dictator which caused physical manifestations of stress on female staff." Plts.' PFOF ¶ 46.

- "Payne acted in a disrespectful, demeaning, belittling manner and instead of trying to lift someone up, he chose to tear them down and beat them." Plts.' PFOF ¶ 53.

- "Payne sexually harassed members of Teresa's staff, including Treadwell." Plts.' PFOF ¶ 77.

- "Payne overwhelmingly reserved his harsh treatment for female employees and did not direct it at male employees."   Plts.' PFOF ¶ 111.

- "James was intimidating toward women at SentryWorld."   Plts.' PFOF ¶ 121.

- "James treated females differently in that he disciplined them but did not

discipline men in the same manner for the same issues."  Plts.' PFOF ¶ 124.

- "James used intimidating, verbal and non-verbal cues which established his dominance over female staff at Sentry."  Plts.' PFOF ¶ 126.

- "James would also disregard female ideas but accept the same ideas if offered by men."  Plts.' PFOF ¶ 129.

- "James ignored requests from female staff."  Plts.' PFOF ¶ 136.

- "James simply did not respect Teresa as a person or take her seriously." Plts.' PFOF ¶ 147.

- "Teresa was unfairly blamed for scheduling issues which were not her fault."  Plts.' PFOF ¶ 153.

- "Teresa was generally a joy to be around."  Plts.' PFOF ¶ 193.

- "Performance reviews at Sentry were unequal and scores depended on a person's gender."  Plts.' PFOF ¶ 202.

- "Teresa's performance reviews were shams based on how negative they were.  They do not accurately reflect Teresa's true performance."  Plts.' PFOF ¶ 206.

- "Women did not trust the human resources department to accurately and effectively address and convey their concerns."  Plts.' PFOF ¶ 249.

- "Women at Sentry were held to a different standard than males."  Plts.' PFOF ¶ 292.

- "Payne allowed his male chefs in the back get away with a lot but nitpicked female staff members."   Plts.' PFOF ¶ 301.

- "David was an outstanding business resource who was supportive and professional."  Plts.' PFOF ¶ 351.

- "Teresa was subject to abusive behavior from James and Payne on a daily basis up to the day she was terminated, including during her termination meeting."  Plts.' PFOF ¶ 538.

These types of statements lack specificity, are unsupported speculation, opinion or legal argument, and are insufficient to raise a factual dispute at the summary judgment stage. Morrow v. Wal-Mart Stores, Inc., 152 F.3d 559, 563 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). There may be evidence in the record that would allow a jury to reach some of the conclusions set forth in plaintiffs' proposed findings of fact, but it is not the court's job to search the record to determine whether any of these broad statements are supported by specific facts and evidence. McKinney v. Office of Sheriff of Whitley County., 866 F.3d 803, 808 (7th Cir. 2017) (it is "not the judge's role" to "comb through the record without a guide to find disputes of material fact that preclude summary judgment"). Therefore, I have disregarded all proposed findings of fact that are actually opinions, arguments, conclusions or statements supported only by inadmissible hearsay. After doing so, I find the following facts to be material and undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A.   Parties and Background

Defendant Sentry Insurance is a Wisconsin mutual insurance company specializing in business insurance. Defendant operates SentryWorld, a golf course and food services complex in Stevens Point, Wisconsin, that includes a casual restaurant

5

called PJ's.   SentryWorld also offers facilities for weddings, banquets, meetings and other events, and hosts approximately 600 banquet events each year.   During all times relevant to this case, Mike James was the general manager of SentryWorld.

In September 2014, SentryWorld, including PJ's, was reopened after being closed for an extended period of time for major renovations.   Before the reopening, James hired plaintiffs David Fischer and Teresa Fischer to work at SentryWorld.   James hired Teresa Fischer as the front-of-house manager for PJ's Restaurant, and he hired David Fischer as executive chef of SentryWorld's banquet services.   James hired plaintiffs because of their significant restaurant experience.   Plaintiffs had previously owned and operated a fine dining restaurant in Eau Claire, Wisconsin.   Plaintiffs both reported to James, but they did not work together or in the same area at SentryWorld.

### B.   Teresa Fischer's Employment with Defendant

1.   2014

As the restaurant manager of PJ's, Teresa was responsible for all front-of-house operations.   Front-of-house tasks included greeting and seating guests, serving food, bartending, clearing tables and preparing napkins and silverware.   Teresa's responsibilities included hiring and managing assistant managers, servers, bartenders and hosts; establishing policies, services standards, objectives and procedures to insure customer satisfaction and profitability; and addressing customer complaints that required management discretion.

6

The back-of-house operations were overseen by the executive chef, who also reported to SentryWorld general manager Mike James.  Back-of-house tasks include preparing and plating food and cleaning dishes.  At the time Teresa was hired in August 2014, Brandon McCormick Guthu was the executive chef at PJ's.

 After PJ's reopened in September 2014, James received feedback from customers regarding the operation of PJ's.  Most of the comment cards submitted by customers were positive.  However, James received several customer complaints about service problems, including slow service, a customer receiving the wrong order and problems with the flow of seating and ordering.  James concluded that Teresa needed to train front-of-house staff more effectively to address these problems.

James told Teresa that he expected her to conduct daily lineups with front-of-house staff to communicate important information, such as daily specials and service problems, and to review SentryWorld's customer service standards.  James also told Teresa that she needed to insure that all of her employees knew and followed defendant's "credo and service standards."  James was disappointed when only two of the front-of-house staff could recite the credo and service standards to James by the end of 2014.

In December 2014, James completed a performance evaluation for Teresa for the period August 2014 to December 2014.  Dkt. #32-5.  The performance evaluation had six potential ratings: exceeds expectations; meets and occasionally exceeds expectations; consistently meets expectations; generally meets, but occasionally falls short of

expectations; improvement needed; and does not meet expectations.

James' performance evaluation for Teresa was mostly positive.  He rated her as "meets and occasionally exceeds expectations" in the   areas of "financial responsibilities" and "clarify purpose and communicate a clear vision."   James rated Teresa as "consistently meets expectations" in the areas of "establishing standard operating procedure book for PJ's," "apply sound business and workforce management practices," "inspire trust and enable open communication" and "align systems to define and manage the work."   James rated Teresa as "generally meets, but occasionally falls short of expectations" in the area of "unleash the talent of self and others."   James rated Teresa as "improvement needed" in the area of "knowledge of the credo and service standards."

In the narrative portion of her evaluation, James highlighted some of Teresa's strengths, including her passion for helping people, her creation of a very friendly staff, expense management and her efforts to develop standard operating procedures.  James noted that Teresa should continue holding daily lineups and that she should involve her assistant managers in the lineups.  James also identified areas for improvement, noting that Teresa should look for ways to establish herself more as a "business leader," rather than as a person with a "motherly/fostering" approach.  James wrote that a business leader provides "clear direction, provides support if and when needed, monitors progress, and holds people accountable."  James was concerned that Teresa coddled staff, was overly accommodating of their requests, particularly with respect to scheduling, and failed to address performance issues out of concern that she would offend or upset

8

employees.   James discussed these concerns with Teresa.   Overall, James rated Teresa as "developing," stating that she was a valuable part of the SentryWorld team.   He also wrote that her staff was to learn the credo and service standards by January 15, 2015.

2.  2015

Beginning in 2015, James attempted to meet weekly in one-on-one meetings with all of the employees who reported to him directly, including Teresa.   James reminded Teresa at the meetings that he expected her to conduct daily lineups with front-of-house staff.   James thought that Teresa was not holding adequate meetings every day and reminded her on several occasions that she needed to do so.   Teresa held daily lineups on most days, but Teresa sometimes shortened the meetings based on time constraints and needs of the restaurant.

Customer feedback in 2015 was mostly positive.   There were a few customer complaints regarding service problems, including customer complaints about such things as long wait times for tables, long wait time for drinks from the bar, non-responsive staff, the wrong food being served, front-of-house staff talking with each other instead of serving customers and customers leaving because they were not receiving service.   James met regularly with Teresa and the back-of-house manager, Guthu, regarding such customer complaints. When James raised customer-service related complaints with Teresa, she sometimes responded by stating, "I don't know how that happened," "my staff would never do that," or words to that effect.   On other occasions when James talked

9

with Teresa about complaints, Teresa debated the merits of the comments or blamed the service issues on back-of-house staff.   James was concerned that some problems seemed to be recurring and that Teresa was unable to offer workable solutions.

In May 2015, James terminated Guthu's employment after learning that Guthu made inappropriate comments to a female employee.   James hired Roger Payne to be the executive chef and back-of-house manager of PJ's.   Payne reported directly to James. Payne became friends with Teresa, both at work and outside of work, and Payne and Teresa had a strong working relationship throughout 2015 and early 2016.   Payne and Teresa initially shared an office in PJ's kitchen area and collaborated on restaurant matters, including efforts to resolve service issues related to food timing.

During the summer of 2015, James had concerns about Teresa's management abilities and what he perceived as her failure to implement procedures that he had discussed with her.   In particular, James was concerned that there was not adequate managerial coverage of the restaurant and supervision of staff.   James told Teresa that she should be scheduling assistant managers to work 50 to 55 hours a week, or more if needed, during busy periods.   However, Teresa regularly scheduled assistant managers to work 45 to 50 hours a week.

James was also concerned about Teresa's handling of reservations for PJ's outdoor patio and "celebration room" (a private room that can seat up to 18 people).   James had told Teresa during management meetings that PJ's outside host should not take reservations for outside tables, but James had observed the host doing so.   There were

10

also several special events that in PJ's celebration room that were not properly booked in the reservation system and for which the assistant managers and front-of-house staff were not prepared.

During the summer of 2015, PJ's began hosting an event called "PJ's live," a weekly summer event that took place on PJ's outdoor patio and included live music, food and drinks.  James and Teresa talked about the logistics of PJ's live for many weeks before its first opening night.  On the opening night of PJ's live, there were multiple problems.  A few minutes before service was to begin, the front-of-house staff were unable to tell James what the food and drink specials were, and the signage for the event listed the incorrect prices for menu items. When James asked Teresa about the incorrect prices, Teresa denied that the prices were wrong.

On June 5, 2015, James gave Teresa a typed performance improvement plan, identifying areas in which Teresa needed to improve.  He wrote that Teresa needed to (1) schedule managers for proper coverage; (2) properly train associates for their specific positions, including for PJ's live events; and (3) communicate with James regarding any major operational changes, such as taking reservations for the outdoor patio.  Dkt. #32-7.

In addition to the concerns noted in the June 5 performance improvement plan, James was concerned that Teresa's management style was too permissive, that she was not communicating expectations to her staff effectively and that she was not holding staff accountable for deficiencies.  James observed Teresa performing tasks that he thought

11

should be performed by other front-of-house staff, such as carrying trays and bussing tables.   (James says he observed front-of-house standing together and talking while Teresa was helping customers, but Teresa disputes that her staff ever stood around and talked when they should have been working.)   James told Teresa that she needed to address poorly-performing employees in a more timely manner, insure that staff was on time for their shifts and insure that staff complied with the dress code.   Teresa told her staff that they needed to be on time for their shifts, and the expectation was that they would call ahead if they were going to be late.   She also told staff that they needed to comply with the dress code.

James also regularly discussed PJ's walkthrough and opening procedures during management meetings and with Teresa in particular.   James had specific expectations about the atmosphere and appearance of PJ's, and expected Teresa to insure that the restaurant  was ready each day at opening.   On multiple occasions in 2015, James observed that front-of-house staff had not completed all of the opening procedures.   The opening walkthroughs took approximately 10 minutes to complete, and required the manager to make sure the restaurant was ready for opening, including insuring that battery operated candles and televisions were turned on, chalkboards were updated, trash was cleaned up,   bathrooms were clean, signs from the night before were put away, tables were set correctly and patio doors were unlocked. On multiple occasions in 2015, James learned that patio doors were not being unlocked at opening.   In September 2015, James observed that, at opening time, all candles and the majority of lights in the celebration

room were off, the fireplace was off, all four televisions in the lounge were off, the opening manager was counting cash at the bar while customers were seated at the bar, a sign from the prior night's event was still out in the restaurant, the closing manager had failed to lock the key lock box in the kitchen the prior evening and there was signage was missing from the self-service area.   James documented these observations in a memo to Teresa.   Dkt. #32-8.   James wrote in the memo that, "[t]he opening and closing procedures of PJ's have been addressed in multiple conversations between Mike James and Teresa and continue to be a problem.   It is important that Teresa understand that failure to demonstrate immediate and sustained improvement will result in disciplinary action, up to and including termination."   Id.

Teresa confided in Payne, the executive chef, regarding her one-on-one meetings with James, expressed frustration to Payne regarding James's expectations about the opening procedures and walkthroughs and told Payne that there was too much to do to be worrying about things like candles.   Payne told Teresa that James wanted the restaurant to be perfect and that she should complete all the tasks that James expected, even if she disagreed with James about their level of importance.

In January 2016, James completed a performance evaluation for 2015 for Teresa. James rated Teresa as "exceeds expectations" in the area of "achieving financial goals." He rated her as "meets and occasionally exceeds expectations" in the areas of "customer feedback" and "staff alignment to the credo and service standards."   James rated Teresa as "consistently meets expectations" in the area of "staffing and staff development."   He

rated her as "improvement needed" in the areas of "staff turnover"; "work systems"; and "apply sound business and workforce management practices."   Finally, James rated Teresa as "does not meet expectations" in the areas of "build and foster trust" and "build talents."

In the narrative feedback portion of the evaluation, James noted that Teresa had worked hard with some of her servers to improve their performance.   James complimented her work and encouraged her to continue working with other staff to improve their performance also.   James encouraged Teresa to focus on improving the performance of her assistance managers, addressing staff performance problems quickly and consistently, removing staff who were not performing well and insuring that staff understood rules and expectations and arrived on time for their shifts.   James also wrote that Teresa needed to work on planning and being better prepared for PJ's events, such as the PJ's live event.   James wrote that he was concerned about customer complaints regarding basic service issues, such as customers leaving because they were not getting service of any kind and training of new staff.

Overall, James rated Teresa as "generally meets, but occasionally falls short of expectations."   James wrote the following summary:

> In review, Teresa has done a great job in some areas and needs improvement in other areas.   PJ's in 2015 was a busy year.   Teresa spent a lot of time in the restaurant and worked hard to handle all of the guests. And overall the restaurant performed very well on a financial basis and customer experience basis.   While there were some customer service issues, by and large the experience was very good.   And the staff continued to improve throughout the year.   One reason for the constant improvement was Teresa's involvement in pushing her team to learn and recite the Credo

and Service Standards.   This has resulted in many staff earning their pin.
I commend Teresa's initiative to get this accomplished.

2015 also had some challenges for Teresa.   Team building with respect to
restaurant managers was and continues to be something that needs to be
firmly addressed and fixed.   There is too much conflict among the different
assistant managers that leads to hurt feelings and back stabbing.
Management needs to be on the same page and feel supported in the event
of conflict – especially in front of non-management associates.   Note any
issues brought to you by associates and bring to the manager in question.
Discuss the issue with the manager.   Resolve any issue with managers in
private and inform the associate on the results.   Teresa needs to be able to
identify a problem and develop a plan to fix it before it becomes a larger
problem.   The term "I don't know how this happened" has been used at
times.   Teresa needs to identify the problem, provide a solution to the
problem and then execute the resolution of the problem so to not reoccur.
Teresa needs to be prepared for events in PJ's.   Plan ahead and confirm
with staff involved to ensure a successful result. I   appreciate Teresa's hard
work over the past year and look forward to working with her to resolve
some of her challenges in 2016.

By the end of 2015, James determined that his working relationship with Teresa

was deteriorating and that a reorganization of PJ's would help address some of the

challenges at the restaurant.   James decided to shift responsibilities, so that Payne, the

executive chef, would oversee front-of-house operations and staff, in addition to back of

house operations.   Teresa would report directly to Payne.    James thought that Teresa

and Payne would work well together to address front-of-house problems.   He knew that

Teresa and Payne had worked well together throughout 2015, and that they had

collaborated on numerous projects to improve the timing of the food service.    In

addition, over the past several months, Payne had created a positive working

environment in the back-of-house operations by eliminating in-fighting among

back-of-house staff and resolving other problems.   Payne had previous experience as a

general manager of a restaurant where he managed both front and back-of-house employees.  When James explained the change to Teresa and Payne, Teresa did not object to the change and said it was going to be "great."

3.  <u>2016</u>

For the first few months of 2016, Teresa and Payne had a positive working relationship, and the employees functioned as a team.  Teresa would jokingly refer to Payne as her "work husband," and Payne would call Teresa his "work wife."  Teresa called the sous chef her "lover."  Teresa says that employees at PJ's routinely sat on each other's laps, and she would occasionally sit on Payne's lap, as a joke.  Teresa did not view any of this behavior as sexual or inappropriate.

However, James continued to perceive problems with how the restaurant was managed.  James noticed that some employees were coming to work wearing clothing or items that violated the company's dress code.  James spoke to Payne about it, and Payne told Teresa that she needed to insure that her staff complied with the dress code.  After Payne spoke to Teresa regarding the need to address violations of the dress code, Teresa permitted a server to continue wearing a nose ring in violation of the dress code and did not discipline the server until Payne intervened.  Teresa also permitted a server to wear shoes to work that violated the dress code on several occasions, before she threatened to stop scheduling him.

James also noticed that the walkthrough procedures were not completed fully on more than one occasion in 2016.  James talked to Payne, who then talked to Teresa

16

about the need to make sure the walkthrough and opening procedures were completed each day. Teresa attempted to complete all of the tasks that James expected to be completed, but she expressed frustration regarding James's expectations and indicated that there was too much to do.

On occasion, James called Teresa and Payne while they were not working to discuss issues at the restaurant. In June 2016, James called Teresa while she was at home to talk about a problem at the restaurant. (According to plaintiffs, Teresa's son was present for the call and heard James say to Teresa, "quit acting like a cunt." James disputes saying this to Teresa, and defendants submitted cell phone records and other evidence to undermine Teresa's son's statements regarding the event.)

During 2016, Payne encouraged Teresa to focus on her management duties, instead of spending time serving food to customers. (Teresa says that Payne told her she was too "soft" and too "motherly," but Payne denies saying this to Teresa.) Teresa interacted well with customers, but Payne thought that Teresa spent too much time serving food while her staff was socializing. Payne told Teresa that she needed more consistent policies and procedures that would hold staff and assistant managers accountable for their duties. For example, one assistant manager did not complete schedules until a day or two before the week began, as opposed to completing them two weeks in advance as expected. Payne talked with Teresa about the scheduling problem and then talked with the assistant manager directly. In addition, two assistant managers only partially completed their inventory responsibilities, and did so four days late.

17

Another assistant manager was responsible for safety and for keeping stairwells and exits free of obstructions, but he failed to do so.   Payne talked with both Teresa and the assistant manager about the stairwells on multiple occasions, but the job was not completed.   Ultimately, Payne spent an entire afternoon decluttering and clearing stairwells and exits himself.   On other occasions, Payne noticed that certain side work was not being completed, such as polishing silver, cleaning trays, preparing napkins and utensils for guests.   Payne spoke to Teresa about establishing a schedule for this work, as there should have been a schedule in place already.

As 2016 progressed, the working relationship between Teresa and Payne deteriorated. The environment at PJ's was demanding, and Payne sometimes yelled at front-of-house staff about their performance.   The majority of the front-of-house staff were women, and some front-of-house staff thought that Payne's management style was overly harsh and aggressive.   Payne swore frequently in front of staff, and his behavior made some employees cry.   (Teresa says that Payne called her a "bitch," threatened to fire all of the front-of-house staff on multiple occasions, and said that he would make it his mission to fire two employees, one who was female and one who was male.   Payne denies saying any of that, but says that he did recommend termination of a male employee who made inappropriate comments and had inappropriate contact with a female worker.   Teresa also says that male front-of-house staff noticed that Payne treated women more harshly than he treated men, but Teresa does not cite admissible evidence to support this.   The deposition testimony she cites states only that a male assistant

18

manager did not think Payne treated him harshly.   Dkt. #45, at 82-83.)

There was tension between front and back-of-house staff during 2016.   At one point, back-of-house staff complained to Payne that servers were returning trays to the kitchen without cleaning them, as the servers were supposed to do.   Payne told Teresa and the assistant managers to insure that trays were being cleaned.   After servers continued to return dirty trays to the kitchen, Payne told the sous chefs that they could put dirty trays on the floor, against the wall, so that servers would know that they needed to be cleaned.   Some sous chefs started throwing trays on the floor in front of servers. (Teresa says that Payne told the sous chefs to throw that trays on the floor and at the servers, but she cites no admissible evidence to support this assertion.)

Teresa tried to avoid angering Payne.   She lied to Payne on two occasions at work.   On a busy night in 2016, Payne asked Teresa why no one was sitting at PJ's community table.   Teresa responded that no one had asked to be seated there.   Payne later learned from an assistant manager that Teresa was holding the table for an employee who was coming much later in the evening, even though it was against PJ's policy to hold tables for non-executive employees.   Payne told James and human resources about the incident.   On another occasion in 2016, Teresa lied to Payne about completing morning walkthroughs.   Payne and James reviewed video surveillance footage and confirmed that Teresa did not complete the walkthrough when she said she had.

The parties dispute whether Payne made inappropriate sexual comments to Teresa or other female staff in 2016.   Teresa says that at one point during 2016, Payne said to

her, "Nice gams, babe.  You should sit on my lap or you should wear shorter shorts."
Teresa says that at the time, she "blew off" Payne's comment because she did not think it
was sexual harassment at the time it was made.  Teresa also says that Payne commented
on her breasts, saying "I can't talk to you right now.  All I can do is see your breasts."
Payne denies that he commented on Teresa's legs or breasts.  Teresa also says that on
one occasion, Payne asked Teresa to sit on her lap in a tone that made her feel
uncomfortable.  Payne denies this occurred.

According to Teresa, Payne also sexually harassed one of her female assistant
managers by making sexual comments, smelling her hair and asking the assistant manager
to wash him in the shower.  Payne denies making any sexually inappropriate statements
or having inappropriate contact with the assistant manager.  (Most of plaintiffs'
proposed findings of fact and evidence regarding Payne's interactions with the assistant
manager are irrelevant to Teresa's claim, as Teresa was either not aware of the specific
allegations until after she no longer worked for defendant, because Payne's actions were
not directed at Teresa or because Teresa testified that she did not think that Payne's
behavior was a big deal.  Dkt. #37 at 286-88.)

In 2016, Teresa told one of her assistant managers that she was thinking about
drafting an anonymous email or letter to James about Payne.  Teresa thought the letter
needed to be drafted from the perspective of a customer to get James's attention.  The
letter would include issues that frustrated Teresa and assistant managers but did not
want to talk about directly to James or Payne, such as reprimands regarding the flow of

the dining room, efficiency and wait times resulting from food service problems.   The assistant manager told Teresa not to write the anonymous letter because they needed to maintain their integrity.   The assistant manager then told Payne about Teresa's plan to write an anonymous letter.   Payne confronted Teresa about the letter, and Teresa told Payne that she was frustrated and upset because she was dealing with a huge work burden and she wanted James to know what was happening in the restaurant.   She then stated that she would never have actually written the letter, and she apologized to Payne.

Most of the customer comments in 2016 were positive, but PJ's continued to have some service problems, including wait times being longer than a customer was told, slow food service and slow bar service.   (The parties dispute whether Teresa was responsible for PJ's service problems or whether the back-of-house staff was also at fault.   The parties also dispute whether Teresa failed to accomplish several tasks that she was assigned during 2016 in a timely manner, including creating training procedures and new menu templates.   Ultimately, these disputes are not material to summary judgment.)

By October 2016, James concluded that Teresa was not an effective restaurant manager and that she should not stay in the restaurant manager position.   James did not terminate Teresa's employment immediately.   Instead, he decided to offer her a new position that he would create:   inventory control.   Between November 2016 and January 2017, James worked with a human resources advisor, compensation advisor, occupational health nurse, health services supervisor, ergonomist and a third-party

company, Employer Solutions, to create a job description for the new inventory control position.   Payne was not involved in creating the inventory control position.

During PJ's 2016 New Year's Eve service, Payne approached Teresa about problems that he thought were occurring with the service.   Some of the food stations were dirty and food orders had not been filled.   Payne told Teresa that he did not think the event was going well and that she needed to get the situation under control.   Teresa did not think the problems were her fault.   (Payne says that Teresa responded in a disrespectful manner and mocked him in front of staff and customers.   Teresa denies being disrespectful.)   Payne later told James that he thought Teresa was disrespectful and insubordinate during the event.   After the New Year's Eve event, Payne no longer wanted to work with Teresa.

During 2016, Teresa kept a written log in which she recorded James and Payne's conduct toward her and other women that she thought was abusive, belittling and otherwise discriminatory.   Her husband, plaintiff David Fischer, had encouraged her to keep the log.   The entire front-of-house management team knew about Teresa's log, but Teresa never told James or Payne about it.

4.   2017

In January 2017, James finalized the job description for the inventory control position.   As part of the job creation process, James and two other individuals completed

a post-offer screening assessment to confirm that persons of varying size and condition could satisfy the physical requirements of the inventory control position.   The job description stated that the employee would be required to lift 50 pounds up to 2/3 of the time, lift up to 100 pounds less than 1/3 of the time, and lift more than 100 pounds less than 1/3 of the time.   James's expectation was that most of the items to be lifted and moved in the new role would be between five and ten pounds, with the occasional need for larger items to be lifted or moved with assistance.   It was James's expectation that no employee at SentryWorld should be lifting more than 50 pounds without assistance from another person.   Although the job would be physically demanding at times, James had frequently seen Teresa carry heavy trays with one hand while quickly walking through PJ's.   James intended to offer the position to Teresa at the end of January 2017.   If she accepted the position, she would complete a post-offer screening assessment to confirm that she was able to meet the physical requirements of the job.   If she declined the position, James and human resources would provide her a separation agreement.

James sent a request for the approval of the position to the senior financial analyst at the end of January 2017.   However, the position was not approved until March 6, 2017.   Around the same time, in March 2017, Teresa noticed that the log in which she had documented James and Payne's purported conduct was missing from the bag she kept in her officer at PJ's Restaurant.   The log was the only item missing from her bag.

On March 7, James, Payne and a human resources manager met with Teresa to give her Payne's 2016 year-end evaluation.   Dkt. #32-13.   (Payne created the

23

evaluation in January 2017.  Although plaintiffs argue that Payne edited the evaluation in March to include more negative feedback, plaintiffs cite no evidence to support their argument.  In addition, defendant submitted evidence showing that the performance evaluation given to Teresa in March is identical to the one Payne created in January except that Payne deleted one sentence from the "overall summary" section.)

The evaluation included feedback that Payne prepared for Teresa's 2016 mid-year evaluation, as well as comments he prepared for her year-end evaluation.  Payne's mid-year comments were optimistic and largely positive, but the comments for the year-end evaluation were more critical.  For example, in the area of "establish a strong assistant management team," Payne's mid-year evaluation wrote that Teresa was working to train new managers after dealing with two problem managers.  The year-end evaluation stated that Teresa's assistant managers were struggling, that communication had deteriorated and there were several specific problems with the management team. Payne's overall rating of Teresa was "does not meet expectations."  Payne gave Teresa a copy of the evaluation and read it with her.

After discussing the performance evaluation, James told Teresa that she was being removed from her restaurant manager position because of her unsatisfactory performance.  James offered Teresa continuing employment in the inventory control position, and gave her a copy of the job description for the position.  The offer was contingent on Teresa's being able to perform the duties of the position.  James also told Teresa that if she did not accept the inventory control position, she had the option of

taking a separation package prepared by the company.  Teresa stated that she would consider the inventory control position and let them know her decision.  She also stated tearfully that she would never manage people the way that Payne does, because his management style was "just not right."

(Teresa states in her declaration that she has physical restrictions because of her size, age, physical stature and status as a cancer survivor that made her unable to perform the physical requirements of the inventory control position.  Dkt. #80, ¶ 63.  However, Teresa provides no details about her physical limitations.  Nor has she submitted any medical records, doctor's opinions or other evidence to support her assertion that she could not have performed the inventory control job.  In addition, Teresa stated at her deposition that she did not have any physical restrictions that would have prevented her from performing the inventory control position at the time she was offered the job.   Dkt. #37, at 249.  Defendant has submitted evidence showing that the person ultimately hired for the inventory control position is female, approximately the same age as Teresa and physically smaller than Teresa.   Teresa's vague statement in her declaration that she had physical limitations is not sufficient to create a genuine factual dispute about whether she could have performed the inventory control position.)

On March 13, Teresa contacted human resources and declined the inventory control position.  She was formally separated from employment with defendant on March 15, 2017.

On March 31, 2017, Teresa's attorney sent a settlement demand letter asserting

that defendant had discriminated against Teresa on the basis of her sex and age.   Before this, Teresa had never reported to James, Payne, defendant's legal department or defendant's human resources department that she had been discriminated against based on sex or that she had been subjected to a hostile work environment based on sex. (Teresa says that James and Payne told her not to report her concerns to human resources, and that she should report concerns to James.   James and Payne deny saying this.)

### C.   David Fischer's Employment with Defendant

#### 1.   2014, 2015 and 2016

Plaintiff David Fischer was hired as the banquet chef by Mike James in July 2014. David was responsible for planning, preparing and executing the delivery of food and beverages for all of SentryWorld's banquet events.   This included reviewing banquet event orders prepared by banquet managers to determine the amount of food needed for an event and ordering the appropriate amount of food.   David oversaw the team of kitchen employees who worked on the banquet events.   He also was very involved in developing banquet menus.   David performed well during 2014 and 2015 and received positive ratings on both his 2014 and 2015 performance evaluations.

In early 2016, James promoted David to the executive banquet chef position at SentryWorld.   In his new role, David was responsible for his banquet chef responsibilities as well as supervising the front-of-house banquet staff.   David was also

involved in preparing and managing the banquet services budget.  David continued to perform well during 2016.

2.  <u>2017</u>

On March 7, 2017, after James removed Teresa from her position as restaurant manager, James met with David.  James told David that Teresa was being removed from her restaurant manager position, but that James wanted to make sure that David stayed employed with the company.  James offered David a $30,000 retention incentive for David's continued employment through at least April 1, 2019.

David told James that he was getting rid of the wrong person, and that David would have gotten rid of Payne more than a year ago.  (In his declaration in opposition to summary judgment, David says that he told James that Payne was harassing women at PJ's.  Dkt.#81, ¶ 74.  I agree with defendant that David's statement in his declaration constitutes a "sham affidavit" because it contradicts the statements he made during his deposition.  The sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony.  <u>James v. Hale</u>, ─F.3d─, No. 19- , 2020 WL 2487603, at *5; <u>Beckel v. Wal-Mart</u>, 301 F.3d 621, 623 (7th Cir. 2002).  At his deposition, David stated that the only thing he told James about Payne at the March 6 meeting was that James was getting rid of the wrong person.  Dkt. #65 at 178-79.  David was asked to describe his "whole memory" of his conversation with James, and he said nothing about discussing Payne's alleged harassment of women. <u>Id.</u>  David's declaration contradicts his deposition testimony and, under the sham

27

affidavit rule, will not be considered.)

Between May and October 2017, James became aware of several problems that occurred during banquet events managed by David.  On May 13, 2017, during the wedding reception of a recently-retired Sentry executive, the banquet department had a problem with the timing of the food service.  (According to David, the problem was caused by an equipment malfunction beyond his control.)  James thought that the problem reflected poorly on defendant.

Also in May 2017, the banquet department served the wrong entree to all of the guests at an event.  (David states in his deposition that his staff prepared the entree identified on the banquet order form, but defendant submitted a copy of the order form showing that David is mistaken.  Dkt. #54-17.  See also Scott v. Harris, 550 U.S. 372, 380 (2007) (facts blatantly contradicted by record should be disregarded at summary judgment).)  James discussed the incident with David at the time of the event, but David had no explanation for why the wrong food was served.

In July 2017, a guest at a banquet event found a twist tie in the guest's salad. A banquet employee told James that the employee likely responsible for the twist tie incident had exhibited other problems with following sanitation requirements, such as not always changing his gloves and washing his hands when switching to a new product to avoid cross-contamination.    James discussed the incident with David.

Also in July 2017, James gave David a deadline of October 2017 to finalize the 2018 banquet menu.  James asked David to "jazz up" the 2017 menu to make it more

interesting and exciting and a less traditional.   James gave David examples and told him to ask for input on the menu from others.   When David provided his initial ideas for the 2018 menu, it was very similar to the 2017 menu.   James reiterated that he wanted David to make the menu more interesting, whether by changing ingredients, changing the descriptions of the items or adding new items.   As an example, James asked David what other types of chicken dishes could be offered, to which David responded, "none." Later, members of David's team told James that David was difficult to talk to and had rejected their ideas about menu planning.

On August 4, 2017, James met with David about three topics that were concerning James.   First, James told David that the employee who caused the twist tie incident needed to have more training and testing on food handling.   Second, James talked to David about his communication style and discussed with David the need to create an open dialog with all team members to insure that they were comfortable approaching him about menus and special requests.   James instructed David to train his sous chef on creating and pricing menu requests within the next 30 days.   Third, James wanted to know how banquet services recorded and prepared for guests' food allergies. James thought this was important because it would require David to put measures in place to insure that banquet order forms were followed correctly.   After two weeks, David had not set up training on food handling for his employee as directed, so James did so.   David also never completed the sous chef's training on creating and pricing menus.

29

Toward the end of August, 2017, James learned that a guest at a banquet event managed by David had found a crumpled paper towel in her pasta.  James spoke with David about the incident a few days later.  James was concerned that guests had found non-food items in their food twice in less than two months, and was concerned that David was not visually inspecting the food going out of the kitchen.

On October 3, 2017, a banquet employee, Cynthia O'Sullivan, approached James to complain about David's treatment of her.  She told James that David talked to her like a child, did not take her seriously, did not listen to her recommendations or involve her in key decisions and was condescending and belittling toward her in front of other staff.  O'Sullivan asked James to change the reporting structure so that O'Sullivan could report to James directly, rather than to David.

At an event on October 8, 2017, banquet services ran out of brats during a golf event.  James was told after the event that David and his team left the venue after the food was served, that multiple food items ran out and that there was no one available to make more food for the guests.  James was also told that when a guest asked a server if there were more brats, the server responded, "I'm just a server," and walked away, never returning to provide food to the attendee or an explanation that there was no more food available.  When James talked to David about the incident, David told James that they had run out of only one type of food.

On October 9 or 10, another banquet employee told James that, during a September 2017 event for the University of Wisconsin Stevens Point, David became

angry with the UW event manager when the event ran late.  The event manager had reported to the banquet employee that David became visibly angry and threw a "fit" because he had to delay food service by 20 to 30 minutes.  (David denies that he became upset or acted unprofessionally.)  The banquet employee also told James that the UW event manager had said that, because of the extremely uncomfortable and stressful interaction with David, he was not inclined to schedule any further UW events at SentryWorld.  Because UW Stevens Point was one of defendant's largest clients, James was extremely concerned about the report.      On October 11, 2017, James decided to terminate David's employment based on the report of David's unprofessional conduct at the UW Stevens Point event, David's communication problems with his staff and the errors that had occurred with banquet events in the recent months. (James did not ask David for his version of the UW Stevens Point event before he decided to terminate David's employment.)  James contacted human resources and scheduled a meeting for the morning of October 12 to discuss terminating David's employment.  During the October 12 meeting, Javier Sotelo, director of employment and employee relations, approved the termination decision.  Following the meeting, human resources emailed James a template memo for James to complete with James' summary of the reasons for David's discharge.  James completed the termination memo and emailed it to human resources on October 14.

Meanwhile, on October 13, 2017, Teresa's attorney made a settlement demand with respect to Teresa's claims.  Counsel also sent a draft complaint alleging sex

discrimination and sexual harassment to defendant's in-house legal counsel.   James did not become aware of Teresa's October 13 draft complaint until October 17.

On October 25, defendant's counsel contacted Teresa's counsel.   (Defendant says its counsel contacted Teresa's counsel to determine whether she also represented David for purposes of discussing David's separation from employment.   Plaintiffs say that defendant's counsel said that negotiations with Teresa would be contingent on David's resigning from defendant.)   On October 26, Teresa's counsel advised defendant's counsel in an email that she had been retained by David also and stating, "Please send me in writing the reasons Sentry has asked for Dave's resignation as a condition for settling Teresa Fischer's discrimination claims against Sentry."   Defendant's counsel did not respond to the email.   On October 27, plaintiffs' counsel left a voicemail for defendant's counsel, stating that, "demanding David's resignation as a condition of settlement with Teresa was unacceptable and an act of retaliation against Teresa and David."   Plaintiffs' counsel also emailed defendant's counsel on October 27, stating that defendant's demand that David resign "as a condition of continuing discussions with Teresa" was outrageous.

On October 30, defendant's counsel called plaintiffs' counsel and left her a voicemail message to provide more information about David's separation from the company and to discuss a separation agreement for David.   Plaintiffs' counsel did not return defendants' counsel's call.

On October 30, 2017, David Fischer sent an email to defendant's CEO, Peter McPartland, advising him about the sex discrimination, hostile work environment and

32

sexual harassment that Teresa and other women had been subjected to at PJ's. David wrote that defendant had conditioned settlement of Teresa's discrimination complaints on David's resignation, without providing "any explanation for why it made this alarming request."

On October 31, defendant emailed plaintiffs' counsel advising counsel that David had been placed on paid administrative absence "earlier today" while Sentry's counsel attempted to negotiate a separation package with David. Defendant stated that a decision to terminate David had been made on October 11, 2017.

OPINION

Plaintiffs are proceeding on the following claims under Title VII of the Civil Rights Act:

(1) defendant discriminated against Teresa Fischer based on her sex;

(2) defendant retaliated against Teresa Fischer because she maintained a log documenting harassing and abusive behavior toward women in the workplace and made charges of discrimination against defendants;

(3) defendant subjected Teresa Fischer to a hostile work environment; and

(4) defendant retaliated against David Fischer because of Teresa Fischer's protected activity and because he had told defendant he opposed the discriminatory and retaliatory conduct against Teresa Fischer.

Plaintiffs also raised a claim that defendant discriminated against David Fischer on the basis of his age, but plaintiffs agreed to withdraw David's age discrimination claim in their summary judgment brief. Plts.' Br., dkt. #77, at 6. Therefore, I will grant

defendant's motion for summary judgment on David's age discrimination claim and will not discuss it further.

In evaluating the remainder of defendant's motion for summary judgment, I must view all evidence in the light most favorable to plaintiffs.  Nicholson v. City of Peoria, Illinois, 860 F.3d 520, 522 (7th Cir. 2017).  Defendants are entitled to summary judgment if plaintiffs cannot present sufficient evidence to create a dispute of material fact regarding any essential element of their legal claims on which they bear the burden of proof.  Id.  See also Fed. R. Civ. P. 56(a).

### A.   Teresa Fischer's Discrimination Claim

Teresa Fischer contends that defendant terminated her employment because of her sex.  At the summary judgment stage, the relevant question for a sex discrimination claim is whether  the evidence would permit a reasonable factfinder to conclude that Teresa's sex caused termination of her employment.  Nicholson, 860 F.3d at 523 (citing Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016)).  See also Barbera v. Pearson Educucation, Inc., 906 F.3d 621, 628 (7th Cir. 2018) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Teresa argues that a reasonable jury examining the record could conclude that she was terminated from her restaurant manager position because of her sex.  I disagree. The record lacks any evidence to contradict defendant's position that Teresa was

removed from the restaurant manager position because she was not meeting defendant's employment expectations. Defendant has pointed to substantial evidence showing that Teresa was not performing at the level that Mike James, the general manager, expected of someone in the restaurant manager position. For example, defendant submitted evidence showing that James perceived Teresa as being unable to properly manager her employees, insure that they complied with dress code and attendance policies and provide constructive feedback and discipline when warranted. James was also concerned about Teresa's failure to comply with opening procedures, her failure to suggest and implement changes to address recurring customer service problems and her lack of candor and honesty when approached about problems. Although Teresa contends that some of James' concerns were unfounded or unfair nitpicking, defendant has submitted evidence to support James' concerns. It is undisputed that some of Teresa's staff failed to comply with dress code policies, that Teresa failed to follow opening procedures on occasion and then lied about it, and that some of Teresa's assistant managers struggled in completing their duties. Further, James' concerns are well-documented in Teresa's performance reviews from 2014, 2015 and 2016, the performance improvement plans from 2015, and the undisputed evidence showing that James met with Teresa regularly and counseled her about these performance problems.

Teresa's arguments to the contrary are unpersuasive or reliant on wholly by inadmissible evidence. Teresa argues that James' use of the term "motherly" as part of his 2014 performance review of her is evidence that he discriminated against her on the

basis of her sex.   Specifically, James wrote that Teresa had a "motherly/fostering" approach and that she should work on ways to lead her team as a "business leader" who provides clear direction, support, monitoring and accountability, rather than as "a person with a 'motherly/fostering' approach."   Dkt. #32-5 at 6.   But James' assessment was not discriminatory.   James' statements do not imply that he thinks a woman could not be a good manager, that being a women was inconsistent with being a business leader or that Teresa should act more like a man.   Instead, James was counseling Teresa about her tendency to act protective of her employees and about what James perceived as her failure to hold her employees accountable for misconduct or performance problems. James' repeated counsel of Teresa regarding her management style confirms that James' statement was not based on discriminatory intent.   See, e.g., Hinds v. Chertoff, No. 1:06-CV-852, 2008 WL 360718, at *3 (W.D. Mich. Feb. 8, 2008) ("By plaintiff's own description, the references to plaintiff being "motherly" appear to relate in large part to her management style, rather than emanating from discriminatory intent.").

Teresa also argues that defendant disregarded the areas in which she performed well, such as customer service and financial performance.   She points to positive statements on customer comment cards and complimentary statements in her performance reviews.   However, a few positive statements in a performance review are not sufficient to show that Teresa was performing her job to defendant's satisfaction. See, e.g., Abrego v. Wilkie, 907 F.3d 1004, 1013 (7th Cir. 2018) (plaintiff's "fully successful" performance reviews not sufficient to defeat summary judgment on

discrimination claim); <u>Zayas v. Rockford Memorial Hospital</u>, 740 F.3d 1154, 1158 (7th Cir. 2014) (courts do not "merely consider whether a plaintiff's actual job performance was satisfactory"; rather, we must also contemplate "factors such as insubordination and workplace camaraderie"); <u>Peele v. Country Mutual Ins. Co.</u>, 288 F.3d 319, 329 (7th Cir. 2002) ("We are unpersuaded by [the employee's] argument that evidence of her poor job performance must be balanced against [her] 'favorable performance reviews.'").

Although James provided positive comments in Teresa's performance reviews, he also identified several areas in which plaintiff needed to improve. His comments show his ongoing frustrations with Teresa's performance in some areas, such as her management of staff. Read in context, the positive comments in Teresa's performance reviews do not cast doubt on the sincerity of the negative comments in the performance evaluations or James' reasons for removing Teresa from the restaurant manager position. To the contrary, Teresa's performance reviews foreshadow James' concerns and frustrations.

Teresa also discusses her own and her coworkers' opinions about her managerial skills. However, Teresa's own perceptions of her performance are not sufficient to defeat summary judgment. "[I]t is the perception of the decisionmaker, not the employee, that is relevant." <u>Adreani v. First Colonial Bankshares Corp.</u>, 154 F.3d 389, 398 (7th Cir. 1998). <u>See also Mills v. First Federal Savings & Loan Ass'n of Belvidere</u>, 83 F.3d 833, 843 (7th Cir. 1996) (employee's perception that "she always completed her work in an acceptable manner, that she never received any formal warnings of poor job performance,

and that her job performance evaluations were generally satisfactory . . . are insufficient to contradict the detailed evidence of First Federal's displeasure with [her] performance"). The general perceptions of Teresa's coworkers or subordinates are also not relevant, unless the coworkers raise specific examples that dispute defendant's evidence. Peele, 288 F.3d at 329 ("[G]eneral statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated."); Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1460 (7th Cir. 1994) ("Our cases . . . give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."). In this instance, Teresa's evidence does not address the specific areas identified by defendant, so it does not call into question the honesty of defendant's belief that her performance was unacceptable in these areas. For example, positive customer comment cards and financial performance do not address James's concerns regarding Teresa's management of her subordinates, her failure to address ongoing service issues and her dishonesty.

Teresa contends that similarly situated male employees were treated more favorably by James and Payne. "[I]f an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." Filar v. Bd. of Education of City of Chicago, 526 F.3d 1054, 1061 (7th Cir. 2008). However, a similarly situated comparator must be "directly comparable to the plaintiff in

all material respects." <u>Formella v. Brennan</u>, 817 F.3d 503, 512 (7th Cir. 2016). Teresa contends that male sous chefs and front-of-house staff were treated more favorably than she was by James and Payne. But these employees are not similarly situated to Teresa, as they were not managerial staff. (In addition, Teresa has submitted nothing but conclusory opinions and perceptions to show that male staff was treated more favorably.)

Teresa also contends that the evidence shows that James treated Payne more favorably than he treated her because Payne engaged in poor behavior and was not terminated. Teresa contends that she and Payne were similarly situated because they were both supervised by James, they were both managers, they were subjected to the same workplace standards and their performance reviews were based on the same criteria. However, Teresa fails to show that Payne had the same shortcomings or engaged in conduct similar to hers or, in particular, that he engaged in conduct of which James was aware. <u>Burks v. Wisconsin Dep't of Transp.</u>, 464 F.3d 744, 751 (7th Cir. 2006) ("[I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a 'comparable set of failings.'") (citation omitted). Teresa was admonished for failing to manage her staff, refusing to follow directions and being dishonest, among other things. Although Teresa has submitted evidence showing that Payne lost his temper, yelled at staff and even made staff cry, Teresa has not submitted evidence showing that James was aware of Payne's conduct or that Payne engaged in the same type of conduct that frustrated James when

39

Teresa engaged in it.

Teresa also argues that defendant's explanation for her termination was pretextual because many of the deficiencies identified by James were minor problems and did not affect the financial success of PJ's. To establish pretext, Teresa needs to show that inconsistencies or contradictions by defendant undermine defendant's stated reason for her termination. Boston v. U.S. Steel Corp., 816 F.3d 455, 465 (7th Cir. 2016). Teresa has failed to do this. The reasons James gave for terminating Teresa's employment were mentioned in multiple performance reviews, a performance improvement plan and a written memo to Teresa. Stelter v. Wisconsin Physicians Service Insurance Corp., 950 F.3d 488, 490–91 (7th Cir. 2020) (rejecting pretext argument where deficiencies were mentioned in multiple performance reviews). It is not enough for Teresa to argue that James' emphasis on certain details was arbitrary or ridiculous. Barbera, 906 F.3d at 630–31 (employer does not need to make "wise or even generally fair decisions, so long as it did not discriminate on the basis of sex"). Teresa has no evidence that James did not sincerely care about the issues he highlighted in her performance reviews and that he used to justified her termination from the restaurant manager position.

Finally, Teresa argues that James' offering her the inventory control position is evidence of pretext, because James knew that she could not perform the job. But Teresa has no evidence showing that James thought that Teresa could not perform the position. Instead, the undisputed evidence shows that James took the effort to create the position

with Teresa in mind and that he thought she could perform the job.

In sum, when all of the evidence is considered together, there are no facts or reasonable inferences from which a reasonable jury could conclude that defendant discriminated against Teresa Fischer because of her sex. Accordingly, defendant is entitled to summary judgment on Teresa's discrimination claim.

## B.  Teresa Fischer's Retaliation Claim

Next, Teresa contends that her termination was retaliation for complaints she made about sex discrimination. Title VII forbids retaliation by employers against employees who "oppose" workplace discrimination. 42 U.S.C. § 2000e-3. To survive summary judgment on a claim of unlawful retaliation under Title VII, Teresa must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) defendant took a materially adverse action against her; and (3) there existed a but-for causal connection between the two. Burton v. Bd. of Regents, 851 F.3d 690, 695 (7th Cir. 2017); Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty., 804 F.3d 826, 833 (7th Cir. 2015).

Teresa's retaliation claim fails on the first element of her retaliation claim, because she has failed to submit evidence showing that she engaged in a protected activity under Title VII. Teresa contends that she engaged in protected activity by (1) documenting James' and Payne's discriminatory conduct in a notebook; and (2) complaining to a human resources representative about discrimination. However, Teresa has submitted

41

no evidence showing that her notebook was disclosed to James, Payne or anyone else involved in the decision to terminate her employment.  A written log of discriminatory conduct cannot qualify as protected conduct for purposes of a Title VII retaliation claim unless Teresa's concerns were communicated to defendant.  <u>Miller v. American Family</u> <u>Mutual Ins. Co.,</u> 203 F.3d 997, 1008 (7th Cir. 2000) ("[A]n employer cannot retaliate when it is unaware of any complaints.").  Teresa's argument that James or Payne *might* have taken her notebook from her office or that they *might* have learned about her notebook from another employee is based on pure speculation, and is not sufficient to defeat summary judgment.  <u>Lavite v. Dunstan</u>, 932 F.3d 1020, 1029 (7th Cir. 2019) (inferences supported only by "speculation or conjecture" are not sufficient to defeat summary judgment); <u>Barrows v. Wiley</u>, 478 F.3d 776, 782 (7th Cir. 2007) ("[W]e certainly cannot rely on our imagination to make a case that the plaintiff did not prove.").

Similarly, Teresa's statement that she complained to human resources about discrimination and a hostile work environment is not supported by evidence.  Teresa testified that she made vague comments about the environment at PJ's to a human resources trainer after a class.  Teresa told the trainer that the culture at Sentry "is so different from the culture at SentryWorld" because "the way that we're talked to is just not like you guys preach for your managers, how you want your managers to treat people."  Dkt. #37 at 206-207.  These vague statements are not sufficient to put anyone on notice that Teresa was complaining about sex discrimination.  <u>Miller</u>, 203

F.3d at 1008 (7th Cir. 2000).

Teresa has failed to submit any evidence showing that defendant removed Teresa from her position because she had complained about sex discrimination. Rather, as discussed above, defendant has submitted evidence showing that it removed Teresa from her position because it was dissatisfied with her performance. Defendant is entitled to summary judgment on Teresa's retaliation claim.

### C.   Teresa Fischer's Hostile Work Environment Claim

Teresa's final claim is that James and Payne created a hostile work environment. Title VII forbids employers from requiring people to work in a discriminatorily hostile or abusive environment. Boss v. Castro, 816 F.3d 910, 919-20 (7th Cir. 2016). Title VII is violated if the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or [pervasive] to alter the conditions of the victim's employment and create an abusive working environment." Id. at 920 (quoting Alexander v. Casino Queen, Inc., 739 F.3d 972, 982 (7th Cir. 2014)). To survive summary judgment on her hostile work environment claim, Teresa must present evidence demonstrating that: (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. Abrego, 907 F.3d at 1015. The court considers the totality of circumstances, examining factors such as:  the frequency of improper conduct;

43

its severity; whether it is physically threatening or humiliating (as opposed to a mere offensive utterance); and whether it interferes unreasonably with the employee's work performance.  <u>Id.</u>  The court also assumes that employees are "generally mature individuals with the thick skin that comes from living in the modern world."  <u>Swyear v. Fare Foods Corp.</u>, 911 F.3d 874, 881 (7th Cir. 2018).  "As a result, employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace."  <u>Id.</u>

No reasonably jury could find that Teresa was subjected to a hostile work environment based on the evidence Teresa submitted.  First, much of the conduct about which Teresa complains was not conduct directed at her because of her sex.  She complains that James was overly critical, ignored her ideas, refused to listen to her explanations and caused her to experience significant stress, but she fails to tie James' behavior to her sex.  Teresa also complains that Payne yelled, swore and treated staff disrespectfully, but she has failed to submit admissible evidence showing that Payne's behavior was motivated by sex discrimination.  Instead, Teresa's proposed findings of fact about Payne's behavior are largely vague, conclusory and based on hearsay statements.

As for James and Payne's allegedly sex-based comments or conduct, Teresa has failed to show that they were severe or pervasive enough to create a hostile work environment.  Teresa says James called her a "cunt" on one occasion during a phone call.  As defendant points out, Teresa's evidence supporting this assertion is questionable, but

44

even if I accept Teresa's assertion as true, I would conclude that it is not enough to show a hostile work environment.   Generally, "[o]ne utterance alone does not create an objectively hostile work environment."   Smith v. Northeastern Illinois Univ., 388 F.3d 559, 567 (7th Cir. 2004).   Here, Teresa admits that she did not hear James call her a "cunt," and she has submitted no evidence stating that James' alleged one-time use of that word had a significant impact on her work performance.   Instead, she testified at her deposition in October 2019 that she was not aware of any inappropriate comments by James.   Dkt. #37 at 182.   Atanus v. Perry, 520 F.3d 662, 676 (7th Cir. 2008) (conduct contributes to hostile work environment only if the conduct "affected [employee's] work performance").

As for Payne, Teresa says that Payne commented on her breasts on one occasion, commented on her legs on one occasion and told her to sit on his lap on one occasion, in a tone that made her feel uncomfortable.   Under Teresa's version of events, these incidents were inappropriate and offensive.   However, these isolated incidents do not show that the environment at PJ's was permeated with sexism sufficiently severe or pervasive to create an abusive work environment.   The Court of Appeals for the Seventh Circuit has held that "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable."   Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir. 2002).   The statements that Teresa attributes to Payne fall into this category.   Teresa does not contend that Payne engaged in this conduct to threaten or humiliate her and,

with respect to the comment about her legs, Teresa admitted that she did not think the comment was sexually harassing or offensive at the time it occurred.   Teresa also admitted that she willingly sat on Payne's lap on more than one occasion, and that employees at PJ's routinely sat on each other's laps.   Moser v. Indiana Dep't of Corrections, 406 F.3d 895, 902 (7th Cir. 2005) ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.") (citations omitted).   Plaintiffs have cited no cases in which similar conduct was deemed sufficient to establish a hostile work environment claim based on sex.   See, e.g., Mercer v. Cook County, Illinois, 527 Fed. App'x 515, 520 (7th Cir. 2013) (comments that "those bitches," "oh, bitch," "go play with yourself," and coworker bumping into employee's backside, in combination with other actions, did not create hostile work environment).

Teresa also cites to Payne's purported harassment of a female assistant manager at PJ's as evidence of a hostile work environment.   However, this evidence is not sufficient to create a genuine dispute of material fact on Teresa's hostile work environment claim for several reasons.   First, harassment directed at someone other than the plaintiff does not have as significant an impact as harassment directed at the plaintiff.   Johnson v. Advocate Health & Hospitals Corp., 892 F.3d 887, 902 (7th Cir. 2018).   Second, many of the comments and much of the conduct discussed by Teresa occurred outside her presence or after Teresa no longer worked for defendant.   Unless Teresa was aware of the comments or conduct while she was still working for defendant, the evidence is irrelevant

46

because such comments and conduct could not have altered Teresa's conditions of employment or created an abusive working environment.  Mason v. S. Illinois Univ. at Carbondale, 233 F.3d 1036, 1046 (7th Cir. 2000) ("Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)."). Third, Teresa has not shown that the incidents that occurred while she still worked for defendant were objectively severe or pervasive.  For example, Teresa testified that she did not think that Payne smelling the assistant manager's hair was a big deal.   Dkt. #38 at 290.

For all of these reasons, Teresa has not presented sufficient evidence from which a reasonable jury could find that the alleged harassment she experienced was based on her sex or that it was severe or pervasive enough to create an objectively hostile working environment.   Therefore, defendant is entitled to summary judgment on Teresa's hostile work environment claim.

### D.   David Fischer's Retaliation Claim

David Fischer contends that defendant terminated his employment because Teresa Fischer had engaged in protected activity and because he told defendant that he opposed the discriminatory and retaliatory conduct against Teresa Fischer.  To succeed on this claim, David has to show that (1) he engaged in a statutorily protected activity; (2) defendant took a materially adverse action against him; and (3) there existed a but-for causal connection between the two.  Burton, 851 F.3d at 695.  David's claim fails

47

because he has not submitted evidence to satisfy the third element of his claim. Instead, the evidence shows that defendant terminated David's employment for legitimate and non-retaliatory reasons.

David contends that the timing of his termination shows that his termination was retaliatory. In particular, he points out that he was terminated on October 31, just a few days after Teresa's attorney submitted a draft discrimination complaint to defendant. He also points to the communications from defendant's counsel suggesting that settlement with Teresa would be contingent on David's voluntary resignation.

However, defendant has submitted undisputed evidence showing that James decided to terminate David's employment on October 11, before Teresa's attorney sent a settlement demand and draft complaint to defendant and before defendant's counsel engaged in any communications with plaintiffs' counsel about potential settlement. Defendant has submitted evidence showing that James scheduled a meeting with human resources on October 11 to discuss David's termination, that human resources approved the termination decision on October 12, and that James completed a memo identifying the reasons for David's termination on October 14, before James became aware of the communications from plaintiffs' attorneys. Plaintiffs have submitted no evidence that creates a genuine dispute regarding defendant's evidence.

In addition, defendant has identified legitimate, non-retaliatory reasons for terminating David's employment. Defendant has shown that James was concerned about errors at banquet events, both large and small, because he thought they reflected

48

poorly on defendant and could cause defendant to lose business. James was concerned in particular about the banquet team's failure to cook and serve food at a proper time at a May 2017 wedding reception, serving the wrong entree at a May 2017 event, allowing a twist tie to fall into a guest's salad in July 2017, serving a guest pasta in which there was a piece of paper towel in a August 2017 and failing to prepare enough food at an October 2017 event. James was also concerned about David's failure to update the catering menu, failure to communicate effectively with his staff and, according to a report from a banquet employee, losing his temper and acting unprofessionally with one of defendant's largest clients in October 2017. Although David denies that he acted unprofessionally or was responsible for the errors identified by defendant, it is undisputed that guests and employees reported to James that these errors occurred, that James thought these errors were significant and that James held David responsible.

For all of these reasons, no reasonable jury could conclude that defendant terminated David Fischer's employment for retaliatory reasons. Therefore, defendant is entitled to summary judgment on David's retaliation claim.

ORDER

IT IS ORDERED that defendant Sentry Insurance Mutual Company' motion for summary judgment, dkt. #28, is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 21st day of May, 2020.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge